```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
                       AT SAN ANTONIO

  BRIAN BELTRAN and
  KARRAH BELTRAN,

                        Plaintiffs,
                                      No. SA:15-CV-00503-XR
  vs.

  UNITED STATES OF AMERICA,           San Antonio, TX
                                      October 5, 2016
                       Defendant.

              PARTIAL TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
                 TESTIMONY OF WILLIAM H. ROGERS, Ph.D.
                BEFORE THE HONORABLE HENRY J. BEMPORAD
                   UNITED STATES MAGISTRATE JUDGE

                             APPEARANCES

  APPEARING FOR THE PLAINTIFFS:

        Mr. Russell W. Endsley
        Law Office of Thomas J. Henry
        521 Starr Street
        Corpus Christi, Texas  78401
        361-985-0600
        rendsley@tjhlaw.com

  APPEARING FOR THE DEFENDANT:

        Mr. James F. Gilligan
        Mr. Joseph Cuauhtemoc Rodriguez
        Assistant United States Attorney
        601 N.W. Loop 410, Suite 600
        San Antonio, Texas  78216-5512
        210-384-7345
        210-384-7305
        jim.gilligan@usdoj.gov
        joe.rodriguez@usdoj.gov



  Proceedings recorded by FTR digital audio recording.
```

INDEX

PLAINTIFF'S WITNESSES                                    Page

  None


DEFENDANT'S WITNESSES

  William H. Rogers, Ph.D.

      Direct Examination by Mr. Gilligan            3

      Cross-Examination by Mr. Endsley              58

      Redirect Examination by Mr. Gilligan          75

EXHIBITS

| PLAINTIFF'S EXHIBITS | IDENTIFIED | OFFERED | RECEIVED |
|---|---|---|---|
| None | | | |

| DEFENDANT'S EXHIBITS | IDENTIFIED | OFFERED | RECEIVED |
|---|---|---|---|
| 46A    Dr. Roger's Report | 48 | 48 | 48 |

THE COURT:  All right.  Mr. Gilligan, you can call your witness.

MR. GILLIGAN:  Doctor, at this -- Judge, at this time, we'd like to call Dr. William Rogers.

THE COURT:  All right.  Dr. Rogers, would you come forward, and the courtroom deputy will swear you in, sir.

COURTROOM DEPUTY:  Raise your right hand.

(Witness sworn.)

WILLIAM H. ROGERS, Ph.D.,

being first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MR. GILLIGAN:

Q. Could you state your name, full name for the record.

A. My name is William Rogers.

Q. And your address?

A. My address is 3528 St. Charles, Missouri.

Q. And your profession?

A. I'm an economist, a professor of economics.

Q. And can we have an agreement that all of the opinions you will -- (*inaudible coughing into microphone*) in this case will be based on a reasonable degree of economic probability?

A. Yes.

Q. Can you tell us a little bit about your -- your background, your present employment.

A. I'm a professor of economics at Lindenwood University.  I'm

also a research fellow at the Hammond Institute which is
embedded in the university.

Q. And where is that university?

A. In St. Charles, Missouri.

Q. Understand.

    And were you a professor at another university?

A. Yes.  Before that, I worked for 12 years at the University
of Missouri, St. Louis, in the department of the economics.

Q. And what types of courses did you teach there?

A. At the University of Missouri, I taught a wide range of
courses including principles of microeconomics, macroeconomics.
I taught public finance, history of American Economic
Development, and the graduate courses I taught were urban
economics and computational statistics.

Q. And can you tell us a little bit about your educational
background?

A. Yes.  So my undergraduate was in -- that was at
Hastings College in Hastings, Nebraska, where I had a major in
international economics.  I went straight to graduate school at
Colorado State University, received a master's degree in
economics in 2001, and then graduated with my Ph.D. in
economics with the fields of public finance and urban
economics.  That was in 2004.

Q. What did you write your Ph.D. thesis on?

A. My dissertation was on homeowners associations and land use

regulation.

Q. So you were trained as an economic -- excuse me.  You were

trained as an economist --

A. Correct.

Q. -- in the university setting?

A. Yes.

Q. Have you also used your services as an economist outside the

university?

A. Yes, I've been a consultant in a variety of activities

including consulting for many policy changes for local and

state governments, union rules, land use --

Q. Businesses?

A. -- regulations.

    For businesses, I have been focused mostly in the -- the

legal setting so --

Q. Understand.

A. -- if you want to count those as businesses.

Q. And just so we're clear, can -- do economists inform the

government?

A. Yes, they do.  They provide not only collect and surveys, a

variety of statistical information, they also provide advice

for policymaking and -- and serve under various other

statistical capacities.

Q. And would that be called macroeconomics?

A. Well, there's a variety.

Q. Okay.

A. So -- so you'd have -- there's a lot of subfields that --

Q. I understand.

A. -- that an economists would be involved in.

Q. Do -- do banks use economists?

A. Yes, they do.  They use economists to estimate demand curves, default rates.  They try to predict future interest rates, that sort of thing.

Q. As an economist, are you familiar with statistics and statistical analysis and methodologies?

A. Yes, I use that on a daily basis.

Q. You do?

A. Yes.

Q. So you've been trained in statistics?

A. Yes.

Q. Understand.

    And, as an economist, can you calculate potential economic losses?

A. Yes, we can.

Q. Okay.  And what were you asked to do in this case, the Brian Beltran matter?

A. I was asked to calculate the economic damages for Mr. Beltran resulting in a car accident on August 11th of 2013.

Q. And -- and, so I'm clear, you were asked to determine a loss of earning capacity?

A. Well, I was asked to calculate what the damages were --

Q. Understand.

A. -- so if the lost earning capacity -- yes, that's lost earning capacity.

Q. And what area of expertise are required to perform this evaluation?  Economic training?

A. Yeah, you'd -- you'd need the combination of economic training and statistical training.

Q. Understand.

    Mathematics?

A. Yes.

Q. Statistics?

A. Yes.

Q. (*Unintelligible*)?

A. Right.

Q. Any others that you can think of?

A. Well, I use a good deal of programming as well that makes my life a little easier, but, other than that, those are the main --

Q. Understand.

A. -- those are the main skills.

Q. Okay.  And what information were you provided to help make your evaluation possible specifically in regards to the loss itself?

A. Right.  So I was first provided with the damages reports by

Mr. Dillman, the expert for the plaintiff.  I was provided

several vocational reports by Mr. Coffee.  I have the tax

records, the deposition of -- or the video deposition of

Mr. Dillman and the deposition of -- written deposition of

Mr. Coffee.

Q. Have you seen the deposition of Mr. Beltran?

A. Yes, I did.  I read that as well.

Q. When you said you had looked at some tax records, were those

years 2010, 2011, 2012, and 2013?

A. Correct.

Q. And that's in your report?

A. That's in my report.

Q. And just so -- just so I understand, what tools or -- or

services or databases did you go to to assist you in your

evaluation and projections?

A. Well, start with the -- there were several, the Center of

Diseases Control provide --

Q. Why did you go to them?

A. They provide the life expectancy tabulations, and then,

after that, you have the Skoog-Ciecka-Krueger Tables that help

you with the work-life expectancy.

Q. And would that be the mark off --

A. The mark-off process.

Q. And what -- what does that provide again, just so we're

clear?

A. That provides the work-life expectancy.

Q. Okay.  And what is work-life expectancy?

A. Work-life expectancy is -- starts with a probability of somebody remaining in the labor force.  So, if you're in the labor force, what are the odds of you being in the labor force in the future.  It's very similar to life expectancy except with work-life expectancy you can move in and out of the labor force unlike life expectancy and --

Q. And -- and this was published in the *Journal of Forensic Economics*?

A. Yes, the *Journal of Forensic Economics*.  They have several publications in there, and the 2011 one is the one I used which is the most current.

Q. And did you use the yield -- yield curve?

A. Yes, I also collected real yield curve data from the Treasury Department.

Q. United States Treasury Department?

A. U.S. Treasury.

Q. Can you explain why you did that?

A. In the past, I would calculate my own using government bonds, so the U.S. Treasury bonds.  But, as a matter of convenience, the Treasury Department is now calculating yield curves, and they're doing that for regulatory purposes.  It has to do with the Dodd-Frank regulations.  So to regulate banks, they -- they are required to publish this information, and it

just makes it convenient for me to -- to use theirs.

Q. And did you look at the Consumer Price Index --

A. I also --

Q. -- for the relevant time frame?

A. Yes, I also used the Consumer Price Index to adjust wages when necessary using the All Consumer Urban Index, and I collected that from -- I didn't collect that directly from the Bureau of Labor Statistics.  I collected it from my colleagues over at the St. Louis Federal Reserve Bank.  They have a wonderful database that makes that easy to do.

Q. And did you collect tax (unintelligible) information in regards to Brian Beltran?

A. From the IRS, I collected information on tax deductions, exemptions, and marginal tax rates for the 2015 year, and I used that to adjust estimates for taxes.

Q. And what, if anything, did you do in your report in regards to estimating future loss -- losses in regards to putting them into real terms of dollars in 2016?

A. Right.  There's -- there's two steps or two different areas where I did that.  The first area was to look at Mr. Beltran's past earnings, and I adjusted those all to 2014.  That allowed me to match up with the 2014 American Community Survey.  But for the estimates that I calculated for future losses, I had to adjust that base to 2016 prices.

Q. And is the methodology that you used to do your

calculations, and the numbers that you arrived at, a recognized and reliable method used by economists around the country?

A. Yes.

Q. And have you used it in other court cases that you've been involved at?

A. This is my first court case.

Q. It is?

A. It is.

Q. Have you used it in other reports?

A. Yes, I have.  So I have conducted 26 reports --

Q. Yes, sir.

A. -- and I -- I have three other reports that are ongoing.

Q. And in regards to your calculations, at some point did you remove the federal income taxes from the gross earnings?

A. Yes, I did.

Q. Why?

A. Well, federal taxes need to be removed out of -- for federal cases, so I had to -- to adjust them.  The point is that people aren't going to be receiving the income that is going to the federal government.

Q. Did you -- did you also look at some reference points under your assumption -- assumptions and procedures?

A. What -- what do you mean by reference points?

Q. Such as the date of the injury.

A. Oh, yes.  Of course, the date of the injury, the date of the

trial were the two major reference points --

Q. Why?

A. -- the date -- the date of the trial allows me to look at past earnings differentiate past earnings and when to start future -- sorry.  Let me back that up.

     The date of the trial allows me to calculate past losses, and then know what date to start the future loss estimates.

Q. Did you consider any type of offsets in your calculations?

A. Yes, I did.

Q. What are offsets?

A. Offsets, so when you're looking at economic losses, the first thing you'll calculate is the earnings potential of somebody.  And, if it's an injury case, in some cases, the person may be able to still work.  Well, you would want to offset the total losses by what they can still work at so that you're not overinflating those loss estimates.

Q. And that's -- if you're looking at a stream of future -- or potential earnings in the future, and your offset is the -- what their --

A. What I expect --

Q. -- earnings are?

A. -- they should be able to earn even with the injury.

Q. And you used math and statistics and arithmetic to -- to develop that stream?

A. Yes.

        MR. GILLIGAN:  Your Honor, at this time, we tender him as an expert (*unintelligible*).

        MR. ENDSLEY:  No objection.

        THE COURT:  All right.  So tendered.

        MR. GILLIGAN:  Great.

BY MR. GILLIGAN:

Q. So, in your expert report, do you have that in front of you?

A. No, I do not.

Q. Okay.

        MR. GILLIGAN:  Okay.  Joe, can you pull up his expert report?

        THE COURT:  Mr. Endsley is happy to hand you a copy, Mr. Gilligan.

        MR. GILLIGAN:  On the stand.  Okay.  Thanks.

                (Off-the-record discussion regarding the report.)

        MR. GILLIGAN:  Excuse me, Judge.

        THE COURT:  You can approach.

BY MR. GILLIGAN:

Q. Sir, I direct your attention to your -- your assumptions under your assumptions and procedure.

A. Yes.

Q. And why did you make that a category of your report?  What was the function of it?

A. I like to lay out some of the basic ideas of how I'm going

to go about doing my -- my research.  Now, some of this is simple as identifying ages and a few other basic things that I'm going to do.  And then everything else from that are in subcategories.  So the assumptions and procedure is the meat of my report.

Q. And --

A. Everything else is a subheading under that.

Q. Understand.

    And that's where you set out the -- kind of estimated the earnings path --

A. Correct.

Q. -- (*unintelligible*)?

    And what assumptions, if any, did you make about warning -- working and wage earnings in regards to his past wages?

A. So his past wages, are you asking about -- well, the past wages are going to be based off of his tax returns.

Q. Yes, sir.

A. And also the -- the plaintiff's expert report.  So, at first, I didn't have the taxes and worked with the expert on the plaintiff's side, and then I added in the tax -- the tax information.

Q. Understand.

    And -- and did you take into consideration his educational level?

A. Yes.

Q. And why is that relevant, if at all?

A. Well, it's relevant, so when you're looking at work-life expectancy, the work-life expectancy varies by the educational status.  So it is important to incorporate that.  Also when you look at future growth.  Growth rate and earnings, especially for the last about 20 years, they're significant -- they vary significantly by education level.  So it's really important to include education level when you're projecting forward what someone's earnings will be.

Q. Now, you said you considered offsets as well; correct?

A. Correct.

Q. In your calculations?

A. Yes.

Q. What, if any, information did you require in regards to offsets from Brad Coffee, the vocational rehabilitation expert for the United States, based on his report and education -- and his deposition?

A. So I relied on the vocational expert, Mr. Coffee, to give me an idea of what type of occupations Mr. Beltran could continue doing with his injuries.  So, basically, he's giving me the -- the range the possibilities based on medical reports and his expertise, and I used those occupations.  In his last report, of the three, he identified that Mr. Beltran should be able to continue work at his employment or similar employment that he

had before the oil industry -- before he was involved in the oil industry.  So that would be management in the car rental industry is where he was at.

Q. Understand.

And -- and why in your analysis did you carry it out to age 80?

A. Yes.  Age 80, so in my procedure, what I'm doing is using work-life expectancy, but I'm taking one step -- step before that.  So work-life expectancy, to understand this, there in the Skoog-Ciecka-Krueger Tables, which a lot of people use, they use the summary statistic, that is for somebody who is 36 years old, they would look -- who was a male with an associates degree, they would look up the appropriate table.  I believe that's Table 25.  They would go to that table, look down, and see somebody who is 36, and then look at the summary statistics.  One of those summary statistics that are often used is the mean work-life expectancy.

Well, what -- and that's -- then what they will do with that is calculate earnings up until that age, and then stop and assume that between the trial and the work-life expectancy somebody will work with 100 percent probability at a particular occupation, and then, afterwards, with zero probability.  So after they hit the average work-life expectancy, they're expected to earn nothing after that.  That's called front loading.

What I did -- I did a procedure that's sometimes called risk adjusting earnings, or I think it's more appropriately called just expected earnings.

Q. What does -- what does risk adjustment calculations take into consideration so the Court --

A. Right.

Q. -- understands.

A. So the work-life expectancy tables, those summary statistics, what's behind those, just like the life expectancy tables, is a probability of still being in the labor force next year.  So if you are a male with an associate's degree, and you're already working, what is the probability that you will work next year.  And they have those probabilities all the way out to age 100.  That's how they calculate it.  Now, if you take all those individual probabilities and essentially add them up, that will give you the summary statistic, the mean work-life expectancy.

What I did was just took their initial probability.  So I have the probability of being in the labor force for each year.  That is the average probability of being in the labor force for each one of those years.  It's all derived from averages for somebody who has an associate's degree, who's a male, that comes from the current population survey.

Q. By using that method, does it also calculate people -- include people that potentially could work beyond 65 or 67?

A. All the way out to 100.  I stopped at 80 because -- for two reasons.  One, the reliability of those estimates get very weak when you get into the higher ages.  Simply for sampling reasons, there are fewer people, there are very few people who are in their 80s or older.  So when the government, the Bureau of Labor Statistics goes out and surveys people, they don't get many people who are in their 90s.  So those numbers are less reliable when you get past 80.

Q. Now --

A. -- and --

Q. -- now you've referenced Table 25 of the Skoog --

A. Skoog-Ciecka-Krueger Tables.

Q. And the Markov Process Model of Labor Force Activity?

A. Yes.

Q. Is that correct?

A. That's correct.

Q. All right.  And it also looks like in your report you talk about employee tenure summary.  What is that?

A. That comes from the Bureau of Labor Statistics, and that is estimating the average time somebody stays at the same job.  So in the -- around 2010, people, males, on average, were about 3. -- would stay in the same job for about 3.8 years.  That's moved up slightly to just over four and a half years.  The purpose of doing that is to see if Mr. Beltran was significantly at jobs longer or a shorter period of time, but

he seemed to be roughly in line with what other workers are at.

Q. What did you do in regards to estimated benefits?  Did you calculate those?

A. Yes, so I --

Q. How?

A. -- I added in benefits.  Like Mr. Dillman, both of us used the federal minimum of benefits of 6.7 percent.

Q. When you're doing these calculations and making these assumptions, did you assume that Karrah Beltran would -- would remain a homemaker?

A. Yes.  So I assumed, for tax purposes, since the tax rates are household, I assumed that they would -- that -- that Mrs. Beltran would be out of the labor -- out of the formal labor force is all I assumed.

Q. And is that -- is that so you have the full financial picture of the home?

A. Yes, you -- you need that to calculate those taxes.

Q. And did you look at life expectancy specifically?

A. Yes, I did look at life expectancy and put that in my report.

Q. And what did you figure out -- how did you figure that out, and what was it?

A. Well, that was simply looking at the table.  So -- so from the Centers of Disease Control, their tables put Mr. Beltran, at the time of the accident is when I -- I had that, it was

78.1 years.  So 78,1 --

Q. Understand.

A. -- 78.1 --

Q. And moving to the associate's degree that Mr. Beltran achieved, why did you use that as a criteria of an active male with an associate's degree as a factor in your report?  Can you explain?

A. Because, like earnings growth, work-life expectancy varies considerably by education and sex.  So, in other words, what I'm trying to use, I start with national averages always, and then, where appropriate, I -- I change the -- or subset the -- the national average to be more appropriate for the case in question.

Q. And in regards to the table that you created, before we get there, so at each age level --

A. Yeah.

Q. -- there's -- is there an estimated probability of active employment for each succeeding year?

A. There's a probability of being in the labor force, yes, for each year.

Q. And is this the average work-life expectancy?  What is this?

A. Well, it is the -- this is the probability -- so it's the average probability of all males with an associate's degree of being in the labor force for that age.

Q. Understand.

Now, I -- I hear the term a lot by economists, work-life --

A. Uh-hum.

Q. -- a work-life expectancy.  What exactly does that mean?

A. So they often -- well, first of all, keep in mind economists are terrible at naming things, so -- so we -- we tend to get a little sloppy with the -- the language.  There's a term called front loading, and what front loading does is use the summary statistic, that is the summary statistic of average work-life expectancy.  And what it will do is say, let's assume that this person will work with a hundred percent probability up to that age, and then with -- and then we'll work with zero probability after that age.  That's called front loading.

Now, it's called front loading for a reason because what you're doing is -- is putting all the probability of working after that age on the earlier years that necessarily increases or creates a bias, an upward bias.  So I don't use that procedure.  What I use are the -- it still comes from the Skoog-Ciecka-Krueger Tables.  I'm just using the underlying data, the underlying probabilities, for each of those years. By attaching the probability of working for each year, you're actually coming up with an unbiased estimate of what the earnings path or the expected earnings would be.

Q. I've also heard the term, and if you could help us with it, what does the work-life statistical average mean?

A. The -- the work -- it's a summary statistic, and it's a summary statistic saying, if -- if we look at the probability of being in the labor force for each of those years and essentially add them up, then that gives us the number of years someone, on average, will work from whatever starting point we -- we begin with.

Q. So -- so just to keep it as simple as possible, why don't you just get the work-life statistical average for the man and just multiply it out?

A. Well, the front-loading procedure is biased upward.  So imagine if you're in -- imagine you're back in college, and you've got your midterm grades coming up, and you have had ten homeworks, and you got an A on all ten homeworks, and then you got a C on the midterm.  And then for your midterm grade you see you have a C plus in class.  Well, you might be really upset because maybe I should have an A minus, but I got all these As.  The problem is those homeworks we're probably not worth as much as -- as the midterm grade, and that's why you have a C minus average.

    What the front-loading procedure does is it treats all of those initial years as not only identical but as a hundred percent probability of being in the labor force, and then treats all the years after the work-life expectancy as zero. So it's saying we -- we are going to treat someone's work life as if we know with certainty they'll be employed until this

date, and then, after that, we know with certainty they're not going to be involved in the labor market.

Q. And -- and, again, what methodology did you use, how did you -- what is -- what is it called?

A. Either -- some people call it risk adjusted earnings or expected earnings.

Q. Is it a recognized and accepted in the field of forensic economics, and -- and is it published in the *Journal of Forensic Economics* as an accepted --

A. It is recognized now.  There is -- the procedure is actually published in the *Journal of Legal Economics* which -- so the *Journal of Forensic Economics* is published by the National Association of Economists --

Q. Yes, sir.

A. -- and then the *Journal of Legal Economics* is published by the American Association of Economic and Forensic Experts.

Q. Okay.

A. I'm a member of both associations, and, honestly, most forensic economists are -- are part of that --

Q. And just to compare and contrast, the method that was used by Everett Dillman, was that the front-loaded method or not?

A. Well, it was -- it was -- had characteristics of a front-loading method in that he was looking -- he was assuming that Mr. Beltran would work with 100 percent probability up to the ages he selected.  70, the age of 70 is well past the

work-life expectancy.  He also picked the age of 65 and referenced an older publication of Skoog and Ciecka, the -- from the 2003 *Journal of Forensic Economics*.  I'm using more updated information.

Q. Does that mean that the older information is unreliable or not?

A. Well, you -- for today, yes, it would be less reliable than today.  The -- the labor market is constantly changing, and so you want to have the most current information you can have.

Q. And what opinion, if any, do you have about calculating earnings out to just a hard mark, like, 65 or age 70 years?

A. Well, those, you're doing two things.  One, you're front loading, so you're already -- already biased upwards, and then you're extending out beyond the average work life.  So you would have to have some pretty clear information on why Mr. Beltran is -- is going to be able to work beyond what the averages are.

Q. Understand.

    I direct your attention to the income section.  What are you doing there?  Are you explaining how you got that stream of in -- income, your calculations?

A. Yes, there's two steps.

Q. Could you walk us through where you got the information, first, in Mr. Coffee's report and why that's relevant?

A. Okay.  Well, we can start off with -- there's a few parts

here, so we'll just walk through the parts.  The first part is to come up with a base earnings.  So, in other words, Mr. Beltran, if you look at his tax records in 2004 -- 2014, 2013, 2012, he's earning more than the average associate's degree earner would earn.  So I first need to come up with a base earnings.

After the base earnings are calculated and inflated to be $2,016, I then create a age-earnings profile.  An age-earnings profile is just describing how somebody would earn over time.  So, typically, in someone's younger years, their earnings are low but growing quickly.  There's a bit of a plateau, and then there's a bit of a decline after that.  And that's total earnings.  That's not necessarily means people who are older get pay cuts, but they tend to work less hours, they're more likely to be unemployed for a period of time, they're much less likely to be picking up overtime, those sorts of things.  So that's the age-earnings profile.

Q. And to be -- to be clear here, it says I calculated geometric mean of Mr. Beltran's earnings.  It's not a geometric mean; is it?

A. No, that was a mistake.  So that -- that is just the arithmetic mean or -- or simple mean --

Q. So it was from --

A. -- that was a mistake in my document --

Q. -- and it was from 2012 earnings through 2014; is that

correct?

A. Correct.  So --

Q. Okay.  And where did that take you?

A. So I took those -- an average of those three years, and that was my base earnings.  From there, I needed to calculate the growth path, so I start with the base earnings, and then I use the American Community Survey.

Q. What is that?

A. The American Community Survey is a major survey conducted by the Census Bureau.  It's effectively used to replace the decennial census when -- when identifying the characteristics of households.  So it's a household survey.  That allows me to look at people in various different educations, including associate's degrees, and see what their average earnings are. So I'm -- I'm calculating here.

     Now, on the growth path with the American Community Survey, there are a lot of outliers in there.  And one of the statistical procedures you need to do is deal with some of those outliers, otherwise, you get biases in your estimates. So I used a median instead of the mean to deal with those.  If I had used -- and usually -- usually, it's the case that if you -- the -- in these earnings data that means are higher than the medians, but, in this case, the mean was lower.  So the growth path I used a median growth path of associate's degrees.

Q. And then just so -- I know you're talking about economic

income stream here --

A. Uh-hum.

Q. -- but, generally, does the pattern for younger people, is that a -- kind of rises, and then, as they get older, it starts to (*unintelligible*) --

A. Yeah, for --

Q. -- and go down --

A. -- an associate's degree your mid to early 40s -- I'm sorry, mid 30s to early 40s are really the peak earnings potential for males with an associate's degree.  After that, you see declines.  Again, not necessarily because your hourly wages have fallen, but you pick up less overtime, you have longer bouts of unemployment while still being in the labor force but longer bouts of unemployment or you cut back on hours.

Q. And what was the next thing you did that's documented in your report?

A. Okay.  So that was the growth path of earnings.  So that's -- that's how those were calculated.  Then, after that, I included in benefits and then took out taxes --

Q. And you're talking -- so it was a net of taxes?

A. Yes.  So --

Q. (*Unintelligible*) taxes?

A. The -- the wages are just total wages, and then I add benefits to that.  The taxes, the federal taxes are taken out in the tax column.  So that's the next step.  So it is net of

federal taxes --

Q. So --

A. -- based on 2015 rates and deductions.

     MR. GILLIGAN:  Can you go to the next page.

BY MR. GILLIGAN:

Q. And -- and it looks like there's a log of earnings?

A. Yes.

     MR. GILLIGAN:  Backtrack there (*unintelligible*).

     THE WITNESS:  So what this is is -- this is the earnings profile.  In the economics profession, this is sometimes called the Mincer Equation by Professor Mincer.  It is widely used in the labor field.  A James Heckman uses it tremendously.  He's a Noble Prize winning economist involved in labor economics and education.  It's -- it's -- there's nothing magical about it, it just -- it's -- it tends to match up with people's earnings profiles.

    so when I described, you see this rise in total earnings, and then you see a decline, that quadratic or -- or sloped function is what I have right there.  So an intercept, the age, and the age squared --

BY MR. GILLIGAN:

Q. And did you --

A. -- provides what's called the Mincer Equation.

Q. And is this what you used to create your table?

A. Yes, it's part of the information.  So that was the growth

path, so I take Mr. Beltran's base earnings, and then follow
that growth path.

Q. And what did Mr. Coffee's report give you additionally?

A. Well, he -- well, he -- he gave a tremendous amount of
information but --

Q. How did that assist you?

A. Well, there were a couple bits of information in there.  One
was the connection -- so I have no expertise in the medical
field, so it allows me to connect what the medical experts are
saying and apply that to occupations.  So Mr. Coffee has given
me a range of occupations that Mr. Beltran could be involved
with in the future even with the injury.  In his -- he, in his
final report, he believed -- or he -- he recorded that
Mr. Beltran is capable of not going back to the oil industry
but going into his previous retail management positions and --
and earning with the experience he has.  In other words, he's
not needing to go into a brand new field and regenerate new
human capital.  He can use his existing human capital to go
back into management.

Q. Understand.

    So that you assisted you in your analysis?

A. Yes, that helped me largely with identifying the offset.

Q. Okay.  And did he give you that offset number?

A. Well, he put in a range.  And so, in his report, he
documented an interview that he had with Mr. Beltran where

Mr. Beltran gave a range of 55 to $60,000 of earnings based on his work in the car rental industry as a manager.  What I used, because it didn't appear that Mr. Beltran -- I'm sorry, Mr. Coffee didn't seem to have the tax records.  Since I had the actual tax records, I included the precise number from his time there in 2012 and part of 2013, and then I just adjusted that for inflation to 2016 dollars.  And, from there, I used the exact same earnings profile that I had from -- for -- for total earnings without the injury.

Q. And did you reduce everything to present value?

A. Everything is reduced to present value, yes.

Q. And what about the discount rate, what did you use?

A. Okay.  So this is where I used the yield curve from the Treasury Department.  And this yield curve, the advantage of it is -- the disadvantages are it's a little complicated, but the advantage of it is it gives you a discount rate for each year, so you don't have a single discount rate.  You have one for each year.  And what that is doing is trying to replicate the need for liquidity early on.  So if you get a lump sum payment, and you're trying to make investment into -- of that lump sum payment, you need some of that cash today for groceries today, and you're going to need some of that for something in the future, one year in the future, five years in the future, but some of the money you won't need until 20 or 30 years down the road.

So for the -- the money that you need right away, you don't want to tie that up into long-term securities.  You want that to be liquid.  That's going to earn a lower interest rate. The stuff that's not needed until 20 years, 30 years from now, that you don't want to put in the really liquid short-term interest rates.  You can handle longer term interest rates, earn a higher interest on that.

Q. And where do you put this money?  Is it in the United States Treasury?

A. These are treasuries.  These are all estimated on treasuries, U.S. Treasuries.

Q. Whether they be short term or long --

A. Or long term.

Q. -- term or midterm or longer term?

A. That's correct.  The Treasury Department is required to use short-term treasuries -- or, I'm sorry, treasuries of the --

Q. Is it recognized in the field of economics --

A. Forensic economics, yes.

Q. I'm sorry.

A. The field of forensic economics, yes.

Q. Yes.  Thank you.  Field of forensic economics (*unintelligible*), those vehicles are treasuries, bonds --

A. Yes.

Q. -- United States Treasury bonds are best and safest?

A. Yes, they are widely used.

Q. And that's recognized throughout the field; right?

A. That is recognized throughout the field.

Q. In regards to this case and these calculations that you performed, I'd like to contrast, before we go into the chart that you prepared to show the Court, a number of things.  In your -- just above your federal taxes, two paragraphs above, do you see that?

        MR. GILLIGAN:  May I approach, Judge?

        THE COURT:  You can.

        THE WITNESS:  The next page.

        MR. GILLIGAN:  The next page, Joe.

        THE WITNESS:  I see where you're at with Page 3.

    Yeah, you may have an old --

        MR. GILLIGAN:  Okay.

        THE WITNESS:  -- there's only four pages in that one, so that may be a previous report of mine.

        MR. GILLIGAN:  Okay.

BY MR. GILLIGAN:

Q. Do you have -- do you have criticisms of Dr. Everett Dillman in regards to whether or not -- or how he did his calculations?

A. Some criticisms, but I can explain some of the differences here.  His report was January -- I believe January 24th, 2016 --

Q. Yes.

A. -- and in that he used the vocational expert available to

him, and so he assumed no offset, that this is a complete loss,
Mr. Beltran would not be able to go to work at all.  So that's
the -- by far the biggest difference between our two estimates
is that I include an offset based on the vocational report that
I received last week, the final one, and Mr. Dillman is using a
vocational report that he received sometime before
January 24th.  That's the biggest difference.  That's number
one.

Number two, with the base earnings, Mr. Dillman assumed
that he -- that Mr. Beltran would be earning the 94 -- I
believe $94,000 working in the oil industry with all the
overtime with certainty from the trial date all the way out
until 60 -- 65 or 70 years old.  That -- that -- that is a
criticism.  I have a criticism of that --

Q. Why?

A. -- I think that is unrealistic for two reasons.  First of
all, the energy --

          MR. ENDSLEY:  Excuse me.

          THE WITNESS:  -- industry --

          MR. ENDSLEY:  I apologize.

          THE COURT:  Yeah.

          MR. ENDSLEY:  Judge, I just want to make sure that
we're not going to get to vocational issues for an economist,
so to the extent his answer deals with vocational issues, I
would object.  To the extent it doesn't, I have no problem with

it.

THE COURT:  Okay.  Well, I haven't heard yet --

MR. ENDSLEY:  Exactly.

THE COURT:  -- so let me hear -- let me hear, if we have anything about --

MR. ENDSLEY:  Trying to preserve --

THE COURT:  -- vocation --

MR. ENDSLEY:  -- the record --

THE COURT:  -- in here, and then we'll see.  All right.  Thank you, Mr. Endsley.

You may answer the question.  You said there are two reasons why you disagreed with the calculation, and I think it was 94,000 approximately --

THE WITNESS:  Right.

THE COURT:  -- traveling out to either 65 or 70?

THE WITNESS:  Correct.

THE COURT:  Okay.

THE WITNESS:  The first --

THE COURT:  Give us economic reasons not vocational ones if you can.

THE WITNESS:  Oh, yes.  Of course.

THE COURT:  Very good.

THE WITNESS:  So what Mr. Dillman said is he's calculating the earnings capacity, and Mr. Beltran has demonstrated that he could earn that because he did earn it.

That -- that is true.  But, keep in mind, earnings capacity, and this is one of the -- the basic features of labor economics, is not just the combination of what -- what we call human capital, that is your skill set, it's the combination of that skill set and also the value of that skill set in the labor market.

So, in other words, earning capacity is not just your work capacity but also the industry's capacity to pay you those wages.  The energy industry, just in general, has been -- is now and has been for as long as there's statistics collected on this, very volatile, so you go through big swings of booms and busts.  That's a very common feature of it.

In that feature, during the booms, not only do they hire more people, but they also hire people to do a lot of overtime.  During the busts, you have people -- they cut back on overtime, and they also lay people off.  Now, so that's my criticism largely of using the $94,000 as a -- a base earnings going forward.

Now, you do that combined with his life expectancy, that is not only are you taking the base earnings, but you're assuming he's going to work, with certainty, in that industry without interruption in his labor market activity until 65 or 70 is not in line with the average -- national averages -- well, it's not in line with national averages.

THE COURT:  Okay.  I have to interpose a question at

this time.

THE WITNESS:  Yeah.

THE COURT:  I didn't understand, from your earlier
testimony, but maybe this is what you're saying, is the
calculation the models that you -- to make these estimates of
what you thought was future earning capacity, did you take into
account this cyclical nature of the environment -- the energy
sector, or were you making your calculations just as a general
work-life capacity and earnings capacity for someone with an
associate's degree not taking into account this particular
sector in which he was working?

THE WITNESS:  So -- so there's two areas here.

THE COURT:  All right.

THE WITNESS:  The area where I accounted for
Mr. Beltran and his experience specifically has to do with the
base earnings where I'm including the years where he was
working in the -- in that industry, so 2013, '12, and '11 --
I'm sorry, 2014, '13, and '12, those years.  Those years
include both his work as a manager and -- and his work in the
industry.  Now, when he gets laid out, I'm not worried about
the full cyclical part of that because if he doesn't get laid
off, or if his hourly -- his overtime gets cut back
significantly, I'd expect he would move in and out of that
industry.

So I'm expecting him to move in and out.  That's going to

truncate the cyclical nature of the industry.  So I don't
expect his earnings to match the cyclical nature of the
industry because he'll move out.  And his work history, which
was well documented by Mr. Coffee, suggests that he does
move -- he has changed jobs on -- on several occasions, and so
I would expect him to continue to do that.  So --

THE COURT:  All right.  Go ahead.

THE WITNESS:  So his base earnings are based on what
he has been doing.  The growth path, the future growth of his
earnings are based on averages of somebody with an associate's
degree.  So it's -- it's a mix of the two.

THE COURT:  Okay.  So then here comes my second
question, and then I'll let you ask more questions.  Because
this is an important issue that I was trying to understand from
what you said before.

You said 2012, '13, '14?

THE WITNESS:  Yes.

THE COURT:  How long of those three years was he in
the oil industry?

THE WITNESS:  About half of that.

THE COURT:  Okay.  Do you think that -- that making a
base earnings, that's exactly -- you see where I'm going --

THE WITNESS:  Uh-hum.

THE COURT:  Making a base earnings model --

THE WITNESS:  Uh-hum.

THE COURT:  -- based on half in and half out --

THE WITNESS:  Right.

THE COURT:  -- sound right to you?  Why?  And, if so, why?

THE WITNESS:  Okay.

THE COURT:  And then I'll -- Mr. Gilligan, he'll just ask it, but this is the thing I was wondering as I was hearing all of this so --

THE WITNESS:  Yeah.  So here's the challenge.  On the one hand, as Mr. Dillman assumed that he would be earning those -- those peak earnings, the 94,000 going forward with certainty, that seems unreasonably high.  Later on, Mr. Coffee, in one of his reports, assumed that Mr. Beltran would not go back into the industry at all.

Now, the tricky thing is to try and understand what are the odds of him moving in and out.  I don't have specific information that allows me to identify how often people move in and out of the oil industry specifically, so I was taking my experience of -- of basically splitting the baby in half, giving him the -- the benefit of him earning, not just in the oil industry, but working that kind of overtime.  He was working a lot of overtime in there, and also backing that off and saying, well, he can probably -- if he's not having all that overtime, he can probably get a job working something similar to what he was earning at the management position.

Now, I had that -- that combination going well out until
he was 80.  Now, I do know, not from the oil industry, but I
know from other physically demanding industries, like the
railroad industry where the Social Security Administration
actually calculates work-life history because there's a special
pension program for -- for railroad workers, so you have a lot
of data on that.  And railroad workers do not -- they are --
they fall out of the labor force much more quickly because it's
physically demanding work.  So I'm having him moving in and out
of the oil industry about half of his work life.  I think
that's an overestimate still, but I wanted to give him the
benefit of the doubt on that.

THE COURT:  And last question, because that leaves
a -- after he moves back out, because he's gotten too old to
work all of that overtime or the heavy work, in a perfect
world, not having had the accident, you have him working other
stuff?

THE WITNESS:  Management -- it's similar to his
management position --

THE COURT:  Gotcha.

THE WITNESS:  -- in retail which I think --

THE COURT:  All right.  I now understand what you
were testifying about before --

THE WITNESS:  Okay.

THE COURT:  Mr. Gilligan, thank you.  I just -- I

just needed to clarify that.  I wasn't clear on what exactly was going on.  Go ahead.

  MR. GILLIGAN:  Joe, can you pull up his table real quick.

  THE WITNESS:  Yeah.

  MR. GILLIGAN:  May I approach, Judge?

  THE COURT:  You may approach.

  MR. ENDSLEY:  Do you mind if I set over here, Judge?

  THE COURT:  I'm sorry?

  MR. ENDSLEY:  Can I sit over here?

  THE COURT:  No, of course.

 They haven't changed the page yet.

  MR. ENDSLEY:  No.  I was making sure it's the same report I have.

  THE COURT:  Oh, I see.

  MR. GILLIGAN:  What I'm going to do is I'm going to ask you to explain the different --

  MR. RODRIGUEZ:  It's 46A.  Do you have that one?

  MR. GILLIGAN:  Top of the chart.

  MR. RODRIGUEZ:  Do you have that one?

  MR. ENDSLEY:  (*Unintelligible*).

  MR. GILLIGAN:  Do you understand it?

  THE WITNESS:  Uh-hum.  Absolutely.

  MR. ENDSLEY:  I'll take another look.

  MR. RODRIGUEZ:  We haven't offered it yet.  That's

right.

Hey, Joe, can I get this turned on?

MR. GILLIGAN:  May I approach, Judge?

THE COURT:  Yes.

THE WITNESS:  Yeah, it was five pages.  So that's --

MR. GILLIGAN:  Is that --

THE WITNESS:  Yeah, that's right.

MR. GILLIGAN:  Very good.

BY MR. GILLIGAN:

Q. Doctor, could you explain for the Court each one of these columns has a heading, date, years, age, I guess that's -- can you -- why does the date have a .3 after it?

A. Well, for precision, I like to use decimal dates when I'm doing my programming.

Q. And the year, it says .5  .5 from what?

A. So -- so years are the number of years after the trial date, so that would be six months after trial.

Q. Understand.

And then the age goes consecutively all the way out to 80?

A. Yes.  Now, that's rounded, so it -- that is starting in 2018.  That's actually 38.3 years, but, yes.

Q. Understand.

And the -- the wages that are next to that --

MR. ENDSLEY:  Excuse me.

THE COURT:  Yeah.

MR. ENDSLEY:  I apologize, Jim.

THE COURT:  Yes?

MR. ENDSLEY:  I don't have this.  I have a different report.

MR. GILLIGAN:  You should have it.

MR. ENDSLEY:  Here's their full report, four pages of four.  This is a different report that I need to -- if it is a different report than I've been provided, I need to address those issues with the Court.  Can I see the report because this is what I have?

MR. GILLIGAN:  Judge, we produced the --

THE COURT:  Well, I'll let you all --

MR. GILLIGAN:  -- the last supplement --

THE COURT:  Wait a minute.  I haven't heard -- I haven't heard -- he's asking you a question --

MR. GILLIGAN:  Yes.

THE COURT:  -- I'm waiting to hear from me, then I'll hear what's going on.

MR. ENDSLEY:  Is this the new report, September 27th?

MR. GILLIGAN:  Yes.

MR. ENDSLEY:  The deadline was 7/22.  So is this -- do you know when this was?

MR. GILLIGAN:  No, I --

MR. ENDSLEY:  Can I get a copy of that, please?  I don't have a copy.

THE COURT:  Okay.  It looks like we're having some sort of report issue.  Let me take a short recess, figure out what the reports are, then I'll hear any objections we have to hear with regard to --

MR. ENDSLEY:  Thanks, Your Honor.

THE COURT:  -- disclosure of the reports.

we'll be in recess for five minutes.

COURT SECURITY OFFICER:  All rise.

(Recess.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  Mr. Endsley, you had a concern about whether you had received a copy of the report from which the witness was testifying.  Let me hear from you as to this matter, sir.

MR. ENDSLEY:  And, Judge, without going through the background details, I have no issue.

THE COURT:  Okay.

MR. ENDSLEY:  We're going -- we worked it out.

THE COURT:  All right.  Very well.

You may proceed, Mr. Gilligan.

BY MR. GILLIGAN:

Q. Sir, we were talking about your chart --

A. Yes.

Q. -- and we are talking about the columns across the top, date, years, age, wages, benefits, the tax --

A. Uh-hum.

Q. -- what tax is that?  Is that normal tax?  Can you explain that column?

A. The -- the tax column.  Okay.  The tax column comes from my estimating his total tax burden based on 2015 exemptions --

Q. I see.

A. -- 2015 deductions and marginal tax rates.  The reason why I calculate each of those is -- I do that as a matter of routine. In some cases, someone's earnings go very high and then very low, and so calculating the -- the marginal tax rates directly is the most appropriate way to do that.

Q. And what's the net earn?  What does that mean?

A. So the net earn is simply the wages plus the benefits, minus the taxes, minus the offset, that's net earned.  It's the -- the difference between what my projection of his earnings capacity is and taking out the expected current actual employment.

Q. What does P. work mean?

A. Yes.

Q. Is that --

A. So P. work is the probability of being in the labor force. So P. work then is for each one of those years, and that's all based on the Skoog-Ciecka-Krueger Tables, or Skoog-Ciecka-Krueger Research.  The tables they have are the summary statistics, and that includes the probability of being

in the labor force.  Now, it's assuming that he is -- for a male, for a associate's degree, and these are the odds of him being in the labor force.

Q. So if I'm 20 years older, and I look at 80, my chances of being in the labor force are .024?

A. Not yours, his because they have to start at a year.  So I'm starting at the trial date.  So if you were to start at somebody -- I've done cases where people were injured before they were 18.  So when I started 18, the probabilities are actually lower when you get out there because there's more of a chance to be out of the labor force, to be injured, there's more of a chance for death, that sort of thing.

Q. And the column for loss --

A. Yes.

Q. -- what loss is that?

A. So that is net earnings times P. work, so that is the undiscounted or unadjusted losses for each one of those years.

Q. Now, then I look at the column discount, and that's the discount rate, of course, or not?

A. Well, that's a discount factor, so it's one divided by one plus the discount rate.  I do this as a matter of convenience. In some of my earlier reports, it made it easier to interact with lawyers if we could just multiply, add, and subtract, and so that's why I do that.

Q. Okay.  And the next column is lost D.  What's --

A. Those are --

Q. -- I thought we already talked about loss.  So why is there a loss D?

A. Those are the discounted losses.

Q. And are they adding up, or for that's for each year?

A. For each year.

Q. Understand.

    And then on the far right is the total?

A. Yes, that's the cumulative, so adding up all -- all of the years, and this way you can double check all the numbers.  The total for the future losses are the last row.  The last row is 200 -- sorry, $402,000.  Those are the total losses calculated in my procedure.

Q. Now, can I just arbitrarily pick a year and say, well, these are the losses of that year, or is the wages model, as set up, is you have to go to the very end in order to --

A. Yes --

Q. -- to integrate it?

A. -- for the total column, you do have to go to the very end to know what the total losses are, that's correct.

Q. So I can't -- I can't go line by line as I march down the years of my life and figure out what that total loss is?  I have to actually -- the methodology you're using is 402,110; is that correct?

A. Correct.

Q. And what is -- so that's the future loss of earning capacity reduced?

A. It's the present discounted value --

Q. I'm sorry.

A. -- of future losses so --

Q. And what would be the -- what would be -- that's the future. What would be the past amount, if you know?

A. Yeah.  So the past amount, I used the base earnings that I previously had calculated and included those for the time between the accident and the trial date.  I did not subtract out any earnings that he's had since then because I don't have complete tax records, of 2015, for example.

Q. So in the very front of your report, on the pretrial loss, you --

A. Correct.

Q. -- you wrote 130 -- 137,154; is that correct?

A. Correct.

Q. Okay.  And what you're saying is there might be some deductions from that, but you don't have that information?

A. I don't have the complete information, so I just left it as the total.

Q. And the post-trial loss that you calculated was 402,110?

A. Correct.

Q. So the total loss that you've calculated, without those objections -- deductions that we just mentioned was, what,

539,264?

A. Correct.

Q. Minus any earnings from 2015 or 2016; is that --

A. Correct.

Q. -- correct?

A. Correct.

Q. Does that actually -- does that globally capture what you've done here?

A. Yes.

Q. Okay.

        MR. GILLIGAN:  And I just have a -- I'm going to talk to my cocounsel.

        THE COURT:  Yeah, you can have a moment.

        MR. GILLIGAN:  Judge, at this time, we'd -- we'd first move to introduce his report as Exhibit 46A if the Court will consider it even though he's testified to a majority of it.

        THE COURT:  Any objection to the report being admitted, Mr. Endsley?

        MR. ENDSLEY:  No, Your Honor.

        THE COURT:  All right.  The report -- 46A will be admitted.

BY MR. GILLIGAN:

Q. And -- and I wanted to ask you, Mr. Rogers, is it reliable to use the Social Security age as the retirement age to render

calculations, and, if not, why not?

A. No.  Now, I do need to qualify.  There's already the issue of the front loading which we've discussed before.  But, secondly, the -- there's two retirement ages with Social Security, the partial retirement and full retirement, but work-life expectancy for a male at the age of 36 or 37 with an associate's degree is well before the -- either one of the -- well, it's well before the full Social Security retirement age.

So it doesn't match up with the -- the averages.  Now, keep in mind, when we talk about retirement, we're looking at work life.  Work life isn't simply when you declare you're retired.  Economists don't ask people when they're retired.  What they do is try to estimate how much time are you spending in the labor market, and so that's what the work life is, is adding up all the time you spend in the labor market.

Q. Now -- and one of the terms you -- you talked about in the very beginning is average statistical work life --

A. Correct.

Q. -- do you recall?

A. Yes.

Q. Do we have an average statistical work life in that table for Mr. Beltran?

A. So, the summary statistic from the Skoog-Ciecka-Krueger Tables would put the work-life expectancy somewhere between 61 and 62.

MR. GILLIGAN:  May I approach?

THE COURT:  Yes, you may.

THE WITNESS:  That is the average.  So, in other words, if you take the typical person, typical male with an associate's degree, add up all the time they're in and out of the labor market, and then smash all the time they're working al together, so it's all consecutive, that would put you somewhere between 61 and 62 closer to 62.

BY MR. GILLIGAN:

Q. Right in here?

A. Correct.

Q. Okay.  But now, if I go across, you said -- you told me I couldn't go across like that and come out with a number; right?

A. Not the total, not that total column.

Q. And what would that number be?

A. So if you are going to do the front-loading procedure, and let's just take 61, for example, the 61 years old, you would go over to net earnings.  So you would take the column of net earnings, and you'd stop at 61, and then you'd take the column of the discount factor, you also stop at 61, multiply those two columns together, and then add up the rows.  If you do that, you're going to come up with a number that's roughly $427,000.

Q. Understand.

And you said that you have a background in statistics?

A. Well, yes.

Q. Okay.  And -- and I wanted to ask you, we've put forth in this case some earlier testimony that if you take a population that potentially has had spinal surgery, and you run it forward two to three percent every year, in 15 to 20 years, more likely than not, you will require additional surgery because every two or -- every year two or three percent are going to require more surgery.  Is that a statistically valid and reliable method to reach that conclusion?

        MR. ENDSLEY:  And, Your Honor, at this time I would object.  He's been identified as an expert in economics not a statistician, A.  B, this goes to a medical opinion which he is not qualified to give and which other experts have already testified to.  C, it goes outside the scope of his designation, it's not in his report, and it's something that has never been provided before today.

        THE COURT:  All right.

        MR. GILLIGAN:  May I -- may I respond?

        THE COURT:  You may.

        MR. GILLIGAN:  He has no idea they are going to put on lumbar -- future lumbar surgery damages.  Part of the way they bootstrapped that in was through that testimony from that doctor, and I would like to -- I would just like an opportunity -- since they opened the door, I would like an opportunity, now that I have somebody who is statistically knowledgeable (inaudible coughing into microphone) the

rationale or the reasoning that was used by the expert witness

that's a medical doctor, not a mathematician or a statistician

or an economist to comment on that methodology whether it was

fundamentally flawed or not.

THE COURT:  The objection is sustained.  You could

have cross-examined that gentleman as to his -- his expertise

in statistics and his analysis.  You did not.  You did not give

him an opportunity to respond to it.  I will not allow

extrinsic evidence to impeach him on that matter, and for all

of the reasons that were described by Mr. Endsley, we're not

getting into statistics with a -- with this -- medical

statistics with this economist.  That's not happening.  So that

objection is sustained.

Move on.

BY MR. GILLIGAN:

Q. As an economist, having availability of data, what is the

percentage of the population that makes it to age 62 in the oil

field, if you know?

A. I do not know in the oil field specifically.

Q. And just -- just so we're clear, I just want to recap with

this.  The joint capacity that you were talking about is the

combination of somebody's skill set, meaning with the -- if you

would explain that.

A. Well, it's just supply and demand.  So the suppliers are the

workers, and they have particular skill sets, and you're

matching that up with employers who are demanding those skill sets.  So somebody's earnings capacity can never be derived solely from their own skills.  It has to be a combination between their skill set and the value of the -- and the value of that skill set in the labor market.  It's a dance with two people.  You can't pick one.

MR. GILLIGAN:  Judge, and I -- and I understand -- thank you.

I understand what the Judge's ruling was, and I'd just like to urge a motion to strike the testimony and preserve the record in regards to the testimony by Dr. Leonard in regards to future lumbar surgery costs which wasn't disclosed in -- in discovery.

THE COURT:  It wasn't disclosed in discovery?

MR. GILLIGAN:  Well, we -- we didn't -- we did not know --

THE COURT:  Okay.  That's a different -- okay. Because before you were objecting that he didn't know what he was doing when he said it was two percent each year --

MR. GILLIGAN:  All right.

THE COURT:  -- that means over a period time.  That we're done with.

But now you're saying that there was a future cost of that --

MR. GILLIGAN:  Well --

THE COURT:  -- just that -- that discovery that he -- did he testify -- I think he just testified to this is what it typically costs now.

MR. GILLIGAN:  There's -- there's no question the doctor --

THE COURT:  So let me hear what you're -- exactly what you're moving to strike.

MR. GILLIGAN:  There's no question that I believe that Dr. Leonard testified that he could subsequently need neck surgery.  However, we did not appreciate that he's also going to offer it on lumbar surgery.  And -- and I could be wrong, but if I think we look at the billing proof --

THE COURT:  Uh-hum.

MR. GILLIGAN:  -- that's there, the past medicals or future, I'm not sure the lumbar surgery has been included.

THE COURT:  Gotcha.

All right.  Let me hear from you, Mr. Endsley.

MR. ENDSLEY:  Absolutely the future lumbar surgery was disclosed.  It was testified about by Dr. Leonard, plus I cross-examined Dr. Agarwal about those particular issues if you recall.  The reason the future neck is the only thing identified is because that's the one surgery all experts agreed to during the depositions, and I knew as a matter of fact that that would come in.  The back surgery was contested by Dr. Agarwal in his deposition and on the stand.  So, clearly,

the fact that I asked those questions means that they were aware of it, and it was disclosed in the course of discovery.

THE COURT:  All right.  Well, a motion to strike will be denied.  We'll have to just see whether there's sufficient evidence to support that -- that there is -- could be either absolutely or some likelihood, I think it would probably be more than -- more likely than not would probably be the test, just guessing, of -- of a future lumbar service -- surgery.

MR. GILLIGAN:  In regards to forethought and preparation of exhibits, we think that if they knew that the proof was there, they would have included it on an exhibit. And the only thing that's listed is on their future -- future surgery --

THE COURT:  Mr. Endsley explained.  It doesn't matter --

Thank you, sir.

Mr. Endsley explained that.  It doesn't matter to me anyway.  That document -- that big chart hasn't been exhibited -- admitted, to my knowledge.  So if that thing gets -- if they move to admit that, we'll have to hear objections to that at that time.

Anything further from this witness, Mr. Gilligan?

MR. GILLIGAN:  No, Judge.

THE COURT:  All right.  Before you ask any questions, Mr. Endsley --

MR. ENDSLEY:  Yes, sir.

THE COURT:  -- I got this chart up in front of me, so I have to ask one more question --

MR. ENDSLEY:  Absolutely.

THE COURT:  -- and I apologize.  No, well I -- it's a question that doesn't involve any particular line.  It involves all the lines.

Here's my question, sir.  In figuring out what his wages would be, I asked you about whether he's moving in and out of the oil field market.  I look at those numbers.  I just looked at all of them.  None of them are $94,000.

THE WITNESS:  Yes, sir.

THE COURT:  So, tell me why, if he was making $94,000 --

THE WITNESS:  Uh-hum.

THE COURT:  -- he's never going to make that much money again in his life is what you're -- is what you're --

THE WITNESS:  Well, this --

THE COURT:  -- what you're guess -- what you're thinking, or there's something in the methodology I don't understand.  That's my only question, sir.

THE WITNESS:  So it's getting into an issue of averages.  So he may be earning more than this, he may be earning less, but this is what I'm assuming that --

THE COURT:  All right.

THE WITNESS:  -- he will be doing, on average, throughout that -- throughout his age earnings profile.  So nobody has earned -- well, very few people have earnings that are this smooth.  The issue is just that --

THE COURT:  I see.

THE WITNESS:  -- sometimes it's more, sometimes it's less, and this is -- this is how I'm smoothing that.

THE COURT:  I understand.  But so it's reasonable in your view --

THE WITNESS:  Yes.

THE COURT:  -- that even, on average, he's never going to get up that -- that high again because that would then be -- that's set -- that's a salary, including overtime, whatever, that's above average --

THE WITNESS:  Correct.

THE COURT:  -- forever?

THE WITNESS:  So yes.  And so if I had 94,000 in there, I assume that there's this -- a reasonable potential that he could be getting more than that and less than that.  It would not be a good midpoint.

THE COURT:  Gotcha.  It wouldn't be a good midpoint. I understand.  Thank you, sir.

All right.  Mr. Endsley, that was my only question.  You can -- can you proceed.

CROSS-EXAMINATION

BY MR. ENDSLEY:

Q. I don't have a whole lot of questions.  I'll be honest with you, I don't understand this stuff, so I don't really ask questions about things I don't understand.

         MR. ENDSLEY:  Can you put that back up, please?

BY MR. ENDSLEY:

Q. I do have a couple of questions about your chart --

A. Yes.

Q. -- so that I can better understand it for later what you're doing.

     And, more specifically, I want to ask you about the line that was originally omitted from your original report and was added in your supplemental report which was dated September 27th of this year; correct?

A. Okay.  Yes.  Yes.

Q. You added this P. work line.  That wasn't in your original report; right?  Was it?

A. No, P. work was always in there.  There's -- there's a different one.  Net earn wasn't in there.

Q. Okay.  Okay.  So P. work.  You're right.  You're right.  It was over here on the other side.

A. I just moved it to -- right.

Q. So why was net earn added?

A. That was to help explain what I'm doing with probability of

work.  What I realize is that my original setup wasn't as clear as it could be, so I moved some columns around, and I added in net earn, and net earn is just a summary of taking wages, plus benefits, minus taxes, minus the offset, and that made it easier for my counsel to -- to understand what I was doing.

Q. Did it affect the numbers (*unintelligible*)?

A. Not at all.

Q. It didn't touch the numbers?

A. Nothing.

Q. It's more of an explain -- explanatory line --

A. Correct.

Q. -- or column?

A. Correct.

Q. Next question:  The P. work line --

A. Uh-hum.

Q. -- this does affect the ultimate number over here (*unintelligible*)?

A. Yes, it does.

Q. Significantly?

A. Yes.

Q. Okay.  And I see how it's kind of sporadic.  Tell me, or tell the Court, if you would, what you used, and point us to it, if you would, to determine what number went in on what year --

A. Uh-hum.  Uh-hum.

Q. -- on this particular (*unintelligible*)?

A. So that has to do with the Skoog-Ciecka-Krueger Tables.  And what they do when they come up with the summary statistic of work-life expectancy, they first look at everyone in the current population survey, and they put people into bins so everyone in their -- everyone who is 20 gets in a bin, everyone who is 21 gets in a bin, everyone who's 22, they put them in those bins.  And then what they do is look at a two-year period.  So the -- the current population survey surveys the same people over two years.

Q. I think you've answered my question --

A. Okay.

Q. -- it's the -- the names of the three people again?

A. Yeah, Skoog-Ciecka-Krueger.

Q. There you go.  That's where you're getting this from?

A. Correct.

Q. And you're taking it straight from them?

A. Correct.

Q. No independent analysis or subjective analysis --

A. No, no --

Q. -- (*unintelligible*)?

A. -- no that is --

Q. And it looks like the older people get, the less likely you believe they're -- they'll be in the work force --

A. Correct.

Q. -- is that right?

A. That's correct.

Q. And that directly affects this number?

A. Yes.

Q. Because, don't forget, and here's where I'm confused --

A. Okay.

Q. -- every year Brad Coffee says there's a vocational impairment, and it's a vocational impairment in the tune of 20 to $30,000 give or take --

A. Uh-hum.

Q. -- some money; right?

A. Uh-hum.  Uh-hum.

Q. But you don't have a 20 to $30,000 hit every year.  Some years you've got a $5,000 hit.  Some years you've got a $4,000 hit.  Some years it only goes up a little over a thousand dollars.  And despite the fact the vocational expert says, there's a 20 to $30,000 hit every year, it's not taken into account on your chart, and I want to know why.

A. The 20 -- what do you mean the 20 to $30,000 hit?  What do you mean by hit?  I'm not sure what you mean by that --

Q. A vocational impairment hit --

A. Yes.

Q. -- Dr. -- Mr. Coffee --

A. Uh-hum.

Q. -- in this reports clearly says --

THE COURT:  Can you go back to the --

MR. ENDSLEY:  Yeah, I'm sorry, Judge.

THE COURT:  That's all right.

BY MR. ENDSLEY:

Q. Clearly says that -- let me grab the report.  I want to read exactly what it says.

A. Okay.

MR. ENDSLEY:  Is it up here?

BY MR. ENDSLEY:

Q. That he believed -- and this is using the lower wage in and not even taking into consideration the oil field industry.

A. Right.

Q. He put the earning capacity, pre-oil field industry, was $55,000 and change; correct?

A. I believe so, yes.

Q. He then said that he believed Mr. Beltran was vocationally impaired to the tune of -- he could do work between 22 and 25 --

A. Oh, yes.

Q. -- thousand a year --

A. Yes.

Q. -- correct?

A. Yes, he did.

Q. So that puts us at a 20 -- or a $30,000 vocational hit every year at that point in time; true?

A. Correct.

Q. And so Dr. -- the vocational expert's opinions were 30,000 per year on the average vocational hit; true?

A. Correct.

Q. Now, your chart doesn't reflect a $30,000 hit every year; does it?

A. No, that's the -- the offset column.  So Mr. Coffee's work is represented in the offset column.  Now, the report you're referring to is the -- Mr. Coffee's September 7th report.  He also issued one later, I believe, it was September 27th that I received -- that updated those numbers.

Q. And I have that, too.  And we can go through that if you'd like.

A. Yeah, so that his September 27th one, and that's the offset. So Mr. Coffee's hit, as you say, that's included in the offset column.

Q. No, actually the offset --

        MR. ENDSLEY:  May I, Judge?

        THE COURT:  You may.

BY MR. ENDSLEY:

Q. The offset actually is going from a no employment, not working at all and making nothing, and then making up for what you believe he can actually earn that year based upon the vocational expert's opinions; right?

A. Based on the vocational --

Q. So this is --

A. -- expert's --

Q. -- the number you think he can earn based upon Brad Coffee's reports --

A. Correct.

Q. -- right?

    And then this is a number that, based upon your thing --

A. Uh-hum.

Q. -- you're saying he should have earned; right?

A. That's correct.

Q. And then, basically, you take these two numbers, subtract them, and then that number should be reflected over here after all your hocus-pocus throughout your chart; right?

A. Well, I don't call it hocus-pocus --

Q. Well, you know what I mean.

        THE COURT:  Maybe you want to rephrase that, Mr. Endsley.

        MR. ENDSLEY:  I apologize.

BY MR. ENDSLEY:

Q. After all of the economic voodoo --

        THE COURT:  Maybe you should try again, Mr. Endsley.

BY MR. ENDSLEY:

Q. After your personal analysis --

A. Correct.  Yes.

Q. Okay.  All right.  This number should be -- is the

difference between this number and that number; right?  So you
basically effectively on the first year walked away 20G of
damages through your personal analysis?

A. For the half year --

Q. Okay.

A. -- so that first -- that first row is half year --

Q. By the --

A. -- but yes.

Q. -- way --

A. Yeah.

Q. -- I'm just looking at simple math, 79,8 --

A. Uh-hum.  Uh-hum.

Q. -- 58,1, with about a $20,000 difference --

A. Uh-hum.

Q. -- you got me at 4500?

A. Uh-hum.  That's correct.

Q. Right.  And so is it fair to say that this is not truly
reflective of the actual damages that Mr. Coffee has opined to
in his report?

A. Well, it's -- it's the actual damages -- what do you mean,
it's not the actual damages opined to the -- to the --
Mr. Coffee's report?

Q. Well, I mean let's just look at it simply --

A. Okay.

Q. -- and let's just look at it from a lay person's

perspective, okay, not somebody with a bunch of degrees and who does these charts, and, you know --

A. Okay.

Q. -- for a living, and -- if there's a $30,000 vocational impairment per year, over the rest of Mr. --

A. Uh-hum.

Q. -- Beltran's work life --

A. Right.

Q. -- we're looking at about, what, 20 -- 29 years of work life yet left apparently?  I mean am I close, approximately?

A. Well, I think it's 24, but, yes, go ahead.

Q. You think 24?

A. Yeah, I believe it's 24 is the -- the number, but go -- go ahead.

Q. That -- wait.  Let's go to -- is 65 reasonable?  Is it reasonable to say people will work to 65?  I mean you will at least give me that; right?  You can't even get Social Security until you're 67.

A. No, I think that's -- that's not what, on average, people do.

Q. Well, let's talk about people who are -- who have a history of working consistently --

A. Uh-hum.

Q. -- and maintain employment.

A. The statistics that are available are just based on sex and

education, the levels.

Q. Right.  But I want to talk to you about -- oh, there's something else.  People who have consistent employment --

A. Uh-hum.

Q. -- and there are no big gaps of employment.  You'd agree that it's -- it's reasonable to say that person is going to work until at least age 65.  That's a reasonable thing; isn't it?

A. Well, no, it doesn't match up with the population.

Q. So it's unreasonable for me to say that Mr. Beltran will work until he's 65?  Is that your opinion?

A. Yes, I -- I do think that's unreasonable to say he's going to work, with certainty, until age 65.

Q. All right.  In the other regard, let's just go with your 61 just for fun today.

A. Okay.

Q. $30,000 a year up till age 61, simple math, what is that number?

A. 35 years you said?

Q. Age 61?

A. Okay.  So 61 from -- from where he's at right now, so that's --

Q. From today.

A. -- about 24 years.  You want to multiply 30 by 24 years, 30,000.  So that's, what, 60, $72,000 -- oh, sorry.  $720,000.

Q. So it's just simple math --

A. I lost a zero.

Q. -- and leaving all the tables and numbers --

A. Well, you --

Q. -- that -- that skew things in the Government's favor.  Just this -- raw math, look at the raw numbers --

        MR. GILLIGAN:  Judge, I'm going to object to --

BY MR. ENDSLEY:

Q. -- you would agree --

        MR. GILLIGAN:  -- sidebars --

        THE COURT:  Sustained.  Let's just stick with -- yeah, I understand the math --

        MR. ENDSLEY:  I apologize.

        THE COURT:  -- there's no -- there's no jury.

        MR. ENDSLEY:  You're right.

        THE COURT:  And I was asking about the tables.  So that's all right, Mr. Endsley.  Go ahead.

BY MR. ENDSLEY:

Q. Raw math, raw math, 722, worst case scenario, right, raw math without all the formulas?

A. Well, no, no.  This -- so I have to -- here's where I'm going to object.  That is based --

Q. You're going to object?

A. Well, I'm sorry.  I'm new to this, so I apologize.

Q. Go ahead.  I'm sorry.

A. That's based on dated information, so Mr. Coffee sent me a report, or I was sent Mr. Coffee's reports, and his final one, on September 27th, didn't have a $30,000 ding.  He explained that you'd have Mr. Coffee going back into employment, the same level of being manager of a retail -- a rental car agency.  So what he was working before.  So that there are no exclusions for him to be able to work at his previous employment before the oil industry.

Q. My opinions are now unchanged, now unchanged, regarding post-injury capacities as provided in the prior report of April 21st.  That was Dr. (*Unintelligible*)'s opinions after he did his court-ordered vocational exam of Mr. Beltran.  My opinion now is unchanged from the post-injury earning capacities provided in my vocational report of April 21st, 2016.  Wasn't that his position with regards toward earning capacity?

A. Well, for the first report, yes.

Q. No, no.  I'm looking at the September 7th, 2016, report which comes after April 2016?

A. No, I have September 27th, so there's three.  So I have -- I did a report based on September 7th, and that table is not up, but I did a report from -- from Mr. Coffee's report from September 7th --

Q. And how much was that -- what were -- what were the findings there?

A. So the findings are where I did include -- so Mr. Coffee explained that there were two occupations, and I -- I don't recall offhand, but he had two occupations one that I think was $20,000, the other one about $34,000.  He explained that it would take a few years to transition from one to the other, and I included that into the offsets.  I don't recall what my final number, but I believe it was roughly twice.

Q. Where is that?

A. Well --

Q. Did you bring it with you?

A. Well, I did not bring it --

Q. (*Unintelligible*)?

A. -- I did not bring it up here, no, I did not.

Q. Then just go through it real simple.  Are those numbers higher than the numbers you provided today?

A. Today, so my past --

Q. Just yes or no.

A. Yeah, my past report is higher.

Q. Okay.  The numbers provided based upon Dr. Coffee's analysis -- okay.  And that's assuming Coffee is right --

A. Correct.

Q. -- we agree with everything he says --

A. Right.

Q. -- you know, giving all the benefit to the Government, your analysis provided, based upon those, (*unintelligible*) report is

higher than the analysis provided today; true?

A. Correct.

Q. Do you have that with you by chance?

A. No, I don't have it up here unless it's in front of me.

Q. Okay.  And you were asked not to discuss those today?

A. No, I wasn't asked anything about my past --

Q. Was there a reason those didn't come up earlier?

A. I don't know.

Q. Or did you discuss those, and I just missed it?

A. No, no, we didn't discuss my past report, no.

Q. Okay.  All right.  So we know that floor, if you will, assuming Coffee is right, and everything he says is accurate, it's 720 for the raw numbers; true?  And that's the one at age 61.  That's giving you four years back --

        MR. GILLIGAN:  Judge, is there a question here?

        THE COURT:  Well, he asked the question true.  Let's stop right there.

        MR. ENDSLEY:  Sorry.

        THE COURT:  Do you have an objection to that question, that their numbers is 30 -- 720,000; true?  Got any objection?

        MR. GILLIGAN:  Was -- was his answer true?

        THE COURT:  I haven't heard the answer yet.  That's why asking.  You stood up -- sir, you stood up, and he was still talking.  That's what I'm trying to figure what your

objection is to.

      MR. ENDSLEY:  Let me re-ask the question, Your Honor.

      MR. GILLIGAN:  He's just sitting there --

      THE COURT:  Okay.  Let's -- we'll -- we'll start over.

    Ask the question again, Mr. Endsley.  Let's see where we are.

      MR. ENDSLEY:  I'm just trying to establish where we are.

      THE COURT:  One question at a time would be great.

      MR. ENDSLEY:  (*Unintelligible*).

      THE WITNESS:  Uh-hum.

BY MR. ENDSLEY:

Q. The floor, when considering Brad Coffee's numbers, or his opinions, and going to -- with regards to taking the oil field out of the equation, it's $720,000 was the raw numbers; true?

A. I -- I don't think that's the floor.  I mean we -- we multiply 24 times 30,000, but I don't know that that's the floor.

Q. Okay.  If you take the raw numbers, and you just do simple math, and you don't do all of this other stuff, that's the number, 720?  That's what established that; right?

A. Well, 24 times 30,000 is 720 --

Q. Now --

A. -- yes.

Q. -- let's go to the next step.

A. Okay.

Q. Let's -- we'll stop talking about this.

A. Okay.

Q. If you use the oil field wages as the --

A. Yes.

Q. -- baseline --

A. Yes.

Q. -- so you go with the 94 --

A. Correct.

Q. -- okay?

And then you look at what Dr. Coffee -- what Coffee said, right, Coffee, with regards to the economic abilities of Mr. Beltran?

A. Uh-hum.

Q. And if you go with the $25,000 a year, what is now your vocational impairment for a year --

A. So --

Q. -- at 94?

A. Well, at 94, you -- well, you still have the -- the -- so you take 94, subtract it by -- if you want to take Coffee's second report, now he did have some transition in there, but I believe his -- his top earnings would have been 34,000.

Q. I give it to you.  Use that number.

A. Okay.  So 34,000 minus the -- the roughly 94, that gets you

to $60,000.

Q. So we have a $60,000 vocational impairment per year if we lose, (*unintelligible*) Coffee's opinions --

A. (*Unintelligible*).

Q. -- they go with the oil field, the wages he actually earned before surgery; right?

A. If -- the second -- the second report and the oil field wages, correct.

Q. A $60,000 hit.  What is the number, if I give you age 61, what is the number at 60,000 per year?  Just do the simple math.

A. So that would be twice what we had before, so that would be about $1.4 million.  That's not -- that doesn't include any present discounting though.

Q. I understand.

A. Okay.

Q. So really the range here that we're dealing with, before we get into the -- the table stuff, is 720 to 1.4?

A. I don't know that that's the range, but it's just those are two different examples.  So you have -- you have an example, and I have a different one.

Q. Thank you, sir.  That's all I have.

       THE WITNESS:  Okay.

       THE COURT:  All right.  Mr. Gilligan, any questions?

       MR. GILLIGAN:  (*Unintelligible.*)

REDIRECT EXAMINATION

BY MR. GILLIGAN:

Q. In regards to Brad Coffee's report, Brad Coffee's report was triggered after Dr. Agarwal did his testing, I believe, and then did his deposition, and he was -- and you -- when Brad Coffee saw what Dr. Agarwal had said that he potentially could lift up to a hundred pounds and no other restrictions, Brad Coffee produced a report that you had an opportunity to see; right?

A. Correct.

Q. And that impacted your figures because it increased the offset; is that true?

A. That's correct.

Q. And so there's a logical process here.  It wasn't just scattered or jumping --

        MR. GILLIGAN:  May I approach?

        THE COURT:  You may.

BY MR. GILLIGAN:

Q. -- so what's -- what's happened here is because of what Dr. Agarwal had said and the vocational rehab evaluation person that generated a report that you would have then seen, it affected what's under the offset column; correct?

A. Correct, the offset column I rely heavily on the vocational expert.

Q. And --

THE COURT:  I'll have to ask you to clarify.  When you say the vocational expert, you mean the September 27th report for the (*unintelligible*) --

THE WITNESS:  For this table --

THE COURT:  Exactly.

THE WITNESS:  -- the September 27th --

THE COURT:  That's why I was checking --

THE WITNESS:  -- but yes --

THE COURT:  Okay.  Because I --

THE WITNESS:  Exactly.

THE COURT:  -- because I -- it sounds like we have three reports, and I wanted to make sure.

THE WITNESS:  I have three reports.

THE COURT:  Go ahead, Mr. Gilligan.

MR. GILLIGAN:  May -- may I approach?

THE COURT:  You can approach.

BY MR. GILLIGAN:

Q. Is this the report from Brad Coffee dated September 27th, 2016, that you are referencing?

A. Yes, it is.

Q. Okay.  And, on the basis of that report from the vocational rehabilitation professional, did you change the offset amount because why?

A. I changed the offset amount because the offset is supposed to be the amount that Mr. Beltran would be able to work to

offset his losses.  And I -- that's -- that's why I changed the offset.

Q. So you were striving for reliability and accuracy?

A. Correct.  Correct.

          MR. GILLIGAN:  Pass the witness.

          THE COURT:  All right.  Anything further, Mr. Endsley?

          MR. ENDSLEY:  No, Your Honor.

          THE COURT:  All right.  And I just need to ask you, again, sir.  You don't remember -- because it sounds like this is the latest report.  You don't remember what the number was for the report before this report?

          THE WITNESS:  It was roughly twice.  It was roughly 800,000.  So that --

          THE COURT:  Roughly 800,000.  All right.

          THE WITNESS:  -- so four -- yeah --

          THE COURT:  That's what I was wondering.

          THE WITNESS:  Yeah.

          THE COURT:  Okay.  Thank you.

          THE WITNESS:  Uh-hum.

          THE COURT:  I thought you said twice, but I didn't know whether it was twice.

          THE WITNESS:  Yes, roughly 800.

          THE COURT:  Thank you, sir.  You may be excused from the witness stand.

(Witness excused from the witness stand. )

(Whereupon said testimony of

William H. Rogers, Ph.D., during the bench trial proceedings

concluded.)

C E R T I F I C A T E

       I, Kristin M. Anderson, a Certified Shorthand Reporter, Registered Professional Reporter, Federal Certified Realtime Reporter, and Official Court Reporter for the U.S. District Court, Western District of Texas do hereby certify:

       That I, as a court-approved transcriber, certify that the foregoing is a correct transcription of the audio recording to the best of my ability from the official digital audio recording of the proceedings in the above-entitled matter;

     That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

       WITNESS my hand on this 19th of October, 2016.


                        */s/ Kristin M Anderson*
                    Kristin M. Anderson, CSR, RPR, FCRR
                    Federal Official Court Reporter